# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| H GUYS LLC, an Illinois limited liability company, | ) ) ) | Case No. 19-cv-4974 |
| Plaintiff, | ) ) | Judge Robert M. Dow, Jr. |
| v. | ) ) ) | |
| THE HALLAL GUYS FRANCHISE, INC., a New Jersey Corporation | ) ) ) ) | |
| Defendants. | | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion for a temporary restraining order ("TRO") and preliminary injunction [3] filed by Plaintiff H Guys LLC ("Plaintiff"). For the reasons stated below, Plaintiff's motion for a temporary restraining order [3] is denied. Counsel are directed to confer and file by 7/31/2019 a joint status report advising the Court as to the following: (1) whether Plaintiff wishes to pursue a preliminary injunction; (2) if so, what expedited discovery will be necessary in advance of a hearing on a motion for preliminary injunction and when that discovery will be completed; (3) a proposed briefing schedule on the motion for preliminary injunction; and (4) whether the parties anticipate that the motion can be resolved on the paper or will require live testimony and/or oral argument and, if either live testimony or oral argument are requested, how many hours of in-court time are anticipated. In the event that in-court time is requested, the Courtroom Deputy will contact counsel to schedule a date and time.

## I. Background[1]

Plaintiff H Guys is an Illinois limited liability company with its principal place of business at 950 Lunt Avenue, in Elk Grove Village, Illinois. Plaintiff has operated two Halal Guys franchise restaurants located at 172 North Wabash Avenue, Chicago, Illinois 60601 (the "Loop Restaurant") and at 49 West Division Street, Chicago, Illinois 60610 (the "Gold Coast Restaurant"). Steven Chong ("Chong") is Plaintiff's Chief Executive Officer (CEO) and Vincent Tan ("Tan") is its Chief Operating Officer (COO). Megan Chong is also a Member of Plaintiff. Defendant THG is a New Jersey corporation with its principal place of business at 131 Main Street, Suite 240, Hackensack, New Jersey. Mohamed Abouelenein ("Mohamed") is Defendant's President, Ahmed Abouelenein ("Ahmed") is its CEO, and Margaret Carrera ("Carrera") is its Chief Development Officer. Until the end of January 2019, Defendant's Director of Franchise Operations was Terry Lee Wilson ("Wilson"). After leaving THG, Wilson worked as a consultant for Plaintiff from February to early July 2019.[2]

Defendant THG sells franchises serving their specialty of chicken and gyro over rice. There are over 60 Halal Guys restaurants, of which Plaintiff became the first franchisee outside the New York area. Plaintiff and Defendant entered into a certain Franchise Agreement dated November 25, 2014 (the "Franchise Agreement") and also multi-unit operator agreement(s) under which Plaintiff currently owns and operates the Loop Restaurant and Gold Coast Restaurant which are the subject of this lawsuit. Pursuant to a Second Addendum to the Multi-Unit Operator Agreement dated March 3, 2015 (the "Addendum"), Plaintiff obtained exclusive territory located

---

[1] The information in this section is drawn from Plaintiff's Complaint [1] and the briefs and other materials that the parties submitted in support of and opposition to Plaintiff's motion for a TRO [3, 8, 9, 11, and 12], including counsels' statements at the July 24, 2019 hearing.

[2] Defendant's counsel represented to the Court that Wilson was close to being fired at the beginning of 2019 but took a vacation and quit.

2

in some of the most valuable and desirable areas in Chicago, within which only Plaintiff could open and operate Halal Guys restaurants. Within that territory Defendant cannot establish nor authorize any other person or entity to establish a Halal Guys restaurant during the term or any extensions of the subject Franchise Agreement. The exclusive territory granted to Plaintiff pursuant to the parties' written agreements included mapped out 0.5 mile radius areas in the Chicago neighborhoods best described as Wrigleyville/Lakeview, the Loop/Jewelers Row, Wicker Park, Gold Coast/Streeterville, and Lincoln Park/Park West. Plaintiff opened its Gold Coast Restaurant in 2016 and its Loop Restaurant in 2017.

Defendant faced allegations of improperly handled food and problems with sanitation at least as far back as April 2018. On April 29, 2018, Wilson sent an email to Ahmed and Carrera detailing problems with Plaintiff's restaurants, including food handling, cleanliness, food safety, and temperature of food storage devices. [8-8] at 9. Also in 2018, Plaintiff's restaurants failed two inspections by the City of Chicago's Department of Public Health. See [8] at 3; [8-9] at 1-2.

On March 22, 2019, Defendant's new Director of Franchise Operations, Melissa Curtin, emailed Plaintiff expressing concerns about unsafe and improper operation of Plaintiff's restaurants, including unlabeled and undated food, incomplete temperature logs, cleanliness issues, refrigerators operating at excessively high temperatures, and cleanliness issues. [8-5] at 3-4. Attached was a detailed inspection report of the restaurants. *Id.* at 6-38.

On May 22, 2019, Defendant conducted audits of the Loop Restaurant and the Gold Coast Restaurant. The audits identified several deficiencies at the two restaurants, including cooler temperatures that were too high, food-warmer temperatures that were too low, inadequate and undated labels on food containers, expired food products, and concerns about the cleanliness of the stores. The written statements in the audit are supported by photographs of the conditions

inside the restaurant. The audit report also expressed concern about a "Tea Ninja" stand operating within the Loop Restaurant. Defendant attached these reports to a May 28, 2019 letter to Plaintiff, notifying Chong and Tay of Plaintiff's default under the Franchise Agreement. [8-2]. The letter described the problems identified in the inspection reports and the contract provisions Defendant claimed had been violated. The letter also directed Plaintiff to cure the problems or Defendant would terminate the Franchise Agreement.

On July 9, 2019, Defendant again audited the Loop Restaurant and the Gold Coast Restaurant. The problems identified in the first audits remained or had worsened. The July 9 audit identified, among other things, food storage temperatures even further out of range than they had been in May, more inadequate and undated labels on food containers, expired food items, raw food sitting in a container on the floor for long periods, and ongoing concerns about the cleanliness of the stores, which Plaintiff did not seem to have addressed after the May 22 audit. [8-3]. Again, the claims were supported by photographs of the restaurant.

On Friday, July 19, 2019, Defendant conducted a follow up audit. The report from the follow up briefly states that both restaurants still had the problems identified in the previous audits and provided photographs in support of those assertions. [8-4]. Also on July 19, Defendant sent Plaintiff a Notice of Termination notifying Plaintiff that Defendant was terminating the Franchise Agreement because of Plaintiff's repeated material defaults under the agreement [3-5].[3] The letter asserted that the conditions of Plaintiff's restaurants violated the health and safety standards of Article 7 of the Franchise Agreement and that operation of the Tea Ninja stand in the Loop Restaurant violated several provisions of the Agreement.

---

[3] The letter is dated July 18, 2019. At the hearing on July 24, 2019, Defendant's Counsel stated that Defendant revised and sent the letter on July 19 and inadvertently failed to change the date.

4

On July 20, 2019, Chong and Wilson had a conversation by text message in which Wilson asserted that Ahmed and Carrera disliked Chong and Tan, that Ahmed instructed auditors to "go hard" on Plaintiff, that Carrera tried to document problems in order to push Plaintiff out of the franchise system, and that Ahmed and Carrera treated Plaintiff worse than other franchisees because Chong and Tan once spoke disrespectfully to Carrera.

On Monday, July 22, 2019, Defendant halted shipments of food and supplies from its supplier, U.S. Foods, to Plaintiff. See [3-6]. Plaintiff filed the instant suit on July 24, 2019.

In this lawsuit, Plaintiff asserts claims for breach of contract and breach of implied covenant of good faith and fair dealing. More specifically, Plaintiff claims that Defendant violated the Illinois Franchise Disclosure Act, 815 ILCS 705/1 *et seq.*, by terminating the Franchise Agreement without good cause. Plaintiff also contends that Defendant violated the implied covenant of good faith and fair dealing in four specific ways. See [1] at 11.

In the motion before the court, Plaintiff seeks a TRO to restore its business operations, including its food supply contract, to status quo prior to the July 19 Notice of Termination. Plaintiff asserts that the termination decision rested on pretextual allegations and was driven by Defendant's desire to sell Plaintiff's exclusive territory without sharing the proceeds with Plaintiff, as well as personal animus. Support for the allegations of animus derives mainly from the text messages Wilson sent Chong sent on July 20. Defendant, in contrast, asserts that the termination decision rested on repeated violations of Franchise Agreements, stressing principally food safety issues but also referencing other issues, such as operation of the Tea Ninja stand in the Loop Restaurant.

## II. Legal Standard

The Seventh Circuit uses a two-step analysis to assess whether preliminary injunctive relief is warranted. See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.,* 549 F.3d 1079, 1085–86 (7th Cir. 2008). This analysis is the same one that is used to determine if a TRO is warranted. *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the movant makes the required threshold showing, then the court moves on to the second stage and considers: "(4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties," *i.e.* the public interest. *Id.* at 662. The Court balances the potential harms on a sliding scale against the movant's likelihood of success. The greater the movant's likelihood of success, "the less strong a showing" the movant "must make that the balance of harm is in its favor." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003).

## III. Analysis

For the reasons explained in this section, the Court concludes that the requirements for entry of a TRO have not been satisfied.

### A. Reasonable Likelihood of Success on the Merits

"At the preliminary injunction stage, the plaintiff must show that 'it has a better than negligible chance of succeeding on the merits so that injunctive relief would be justified.'"

*Personeta, Inc. v. Persona Software, Inc.*, 418 F. Supp. 2d 1013, 1016 (N.D. Ill. 2005) (quoting *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 897 (7th Cir. 2001)). Plaintiff has failed to make this showing.

Plaintiff asserts that Defendant's termination of the Franchise Agreement violated 815 Ill. Comp. Stat. Ann. 705/19 because it was without good cause. The act defines good cause as follows:

> (c) "Good cause" shall include, but without the requirement of notice and an opportunity to cure, situations in which the franchisee:
> (1) makes an assignment for the benefit of creditors or a similar disposition of the assets of the franchise business;
> (2) voluntarily abandons the franchise business;
> (3) is convicted of a felony or other crime which substantially impairs the good will associated with the franchisor's trademark, service mark, trade name or commercial symbol; or
> (4) repeatedly fails to comply with the lawful provisions of the franchise or other agreement.

815 ILCS 705/19. It is unlikely that Plaintiff will be able to show that the termination was without good cause, because the record to date indicates multiple detailed inspection reports, documented with photographs, setting out serious violations of sanitation and food safety standards. Section 19(c)(4) states that a franchisor has "good cause" to terminate a franchisee without notice and an opportunity to cure if the franchisee "repeatedly fails to comply with the lawful provisions of the franchise or other agreement." Article 7 of the Franchise Agreement sets out in multiple places the food safety standards to which the franchisor here may hold its franchisee. Defendants' letters of May 28 and July 19, incorporating the results of the inspections of May 22, July 9, and July 19, explain in detail Defendants' view that Plaintiff was not in compliance with the Article 7 standards and Defendant's justification for invoking the automatic termination with no right to cure provision set out in Section 17.1.3(g) of the Franchise Agreement. The evidence that the termination was for good cause under 815 ILCS 705/19(c)(4) is, at least at this stage, strong.

It is true that Plaintiff disputed some of the food safety issues raised in the May 29 letter. The record contains no affidavit addressing, much less refuting, the food safety concerns noted in the July 19 letter. An overall theme of Plaintiff's complaint and memorandum of law is pretext, but at this moment that theme is supported mainly by the text messages referenced above. The Court takes these texts with several grains of salt, given that they were not made under oath and their source is a former employee of Defendant who may have left when he thought he would soon be fired. Moreover, it certainly is possible that Defendant did not like Plaintiff and its principals, yet still had good cause to terminate the Franchise Agreement due to Plaintiff's repeated poor performance on health and safety inspections.

Plaintiff is similarly unlikely to succeed on its claim for a breach of the implied covenant of good faith and fair dealing. Plaintiff argues that Defendant breached the implied covenant in four ways:

> "a. Betraying Plaintiff's reasonable expectation that Defendant would not unilaterally attempt to terminate its franchise after Plaintiff spent significant time, resources, and capital in its Gold Coast and Loop Restaurants;
> b. Apply its personal biases and animosity and apply pretextual reasons to willfully, deceitfully, and falsely destroy and take Plaintiffs franchised business, restaurants, and exclusive territory for its own benefit and profit;
> c. Interfere with Plaintiff's ability to sell its Gold Coast and Loop Restaurants in order for Defendant to achieve the aforesaid ends for its own benefit and profit; and,
> d. Engage in its own breaches of the Subject Franchise Agreement thus depriving Plaintiff of notice, warning, and opportunity to cure defaults which may or may not exist with the resultant consequence of devastating lost livelihoods for the families of approximately 50 employees of Plaintiff."

[1] at 11. On the first point, Plaintiff may have a reasonable expectation that Defendant would not unilaterally terminate the Franchise Agreement, but that assumes Plaintiff's compliance with the Agreement, including the health and safety provisions. Here, the record shows repeated, significant problems regarding health, safety, and sanitation at the Plaintiff's restaurants. Plaintiff's second and third points are not well-supported by the record, and whatever personal

8

feelings or motivations Defendant may have had, Plaintiff's obligation to maintain food and safety standards remains.  Finally, even if Plaintiff can show a technical breach of the notice provision of the Franchise Agreement, it has little justification for complaining about it.  Plaintiff's counsel alleged that Defendant did not send the July 19 Termination Notice to the correct address pursuant to the Franchise Agreement's notice provision (the "Notice Address").  However, Plaintiff provided written notice to Defendant on May 29, 2019 that the Notice Address was no longer correct, and that all future notices should be sent to 950 Lunt Ave., Elk Grove Village, IL 60007. [8-1] at 1-2.  Defendant sent the July 19 letter to the Lunt Avenue address, as asked; Plaintiff now has no grounds to complain, because Defendant complied with Plaintiff's own request to send corporate mail to an address other than the one in the Franchise Agreement.  Furthermore, Defendant's counsel represented to the Court that Plaintiff's counsel sent him an email that acknowledged receipt of the July 19 Termination Notice and did not ask for strict compliance with the terms of the Franchise Agreement, or for notice to be served by other means or at another address.  Plaintiff had actual notice of the termination and Defendant complied substantially with the requirements of the Agreement.  The Court sees no prejudice to Plaintiff on this issue and believes it is unlikely that Plaintiff would prevail on this claim.

Plaintiff also reads the last paragraph of the July 19 Termination Notice as a statement by Defendant that it would not take any action to effectuate the termination for five days and as an invitation to discuss the letter, which Plaintiff says was subverted when Defendant blocked Plaintiff's access to food and supplies before the five day period had run.  That paragraph reads, "THG expects that you will abide by the terms of this Notice of Termination and your Franchise Agreement so that further action on THG's part will not be necessary.  If you have any questions or wish to discuss this matter and the demands set forth herein further, please contact the

9

undersigned within five (5) calendar days." The Court inquired about the meaning of this paragraph at oral argument and considered the parties' statements and submissions on how to interpret it. The Court also considered a July 24 email [12-4] from Defendant's paralegal to Plaintiff following up on a previous conversation about a new Franchise Disclosure Document, and Plaintiff's argument that the email is evidence that the July 19 Termination Notice was not immediately effective.

Based on the materials presented to date, the Court concludes that the termination was immediate and that the final paragraph of the July 19 Termination Notice did not walk back the entirety of the preceding six pages of the Notice. A more reasonable interpretation of the final paragraph is that Defendant does not want to take legal action unnecessarily and was willing to discuss the way termination would play out—for example, if Plaintiff had questions about its post-termination obligations, or wanted to negotiate return of Defendant's equipment or branded products, or needed additional time or resources to remove signs that fall under Defendant's trademark or other intellectual property. The July 24 email [12-4] does not convince the Court otherwise. A paralegal's follow-up on a prior conversation does not contradict or cancel the Defendant's July 19 Notice of Termination, and it seems more likely that the paralegal simply was not aware that Plaintiff's franchise agreement had been terminated a few days earlier. Because Plaintiff has failed to show a reasonable likelihood of success on the merits of either of its claims, this factor weighs in favor of denying the motion for a TRO.

**B.     Adequacy of Remedy at Law**

Plaintiff claims to have made an investment of approximately $1.4 million in the franchise operations. According to Plaintiff, the loss of the contract with U.S. Foods—the supplier mandated under the Franchise Agreement—has already imposed significant (though not yet irreparable)

damage on the business. When the Court explored at the TRO hearing the prospects for obtaining further inventory and operating the business as a restaurant without the tie to the national franchise, counsel for Defendant pointed to Section 10.3.1(d) of the Franchise Agreement, as well as an addendum applicable to at least one of the two Chicago locations, which sets out certain limits on Plaintiff's opportunity to compete with Defendants following termination. Given these limitations, it appears that Plaintiffs could obtain restaurant supplies from U.S. Foods or similar suppliers and operate a restaurant, but not one similar to their current operation. The upshot is that termination might inflict serious or even terminal harm to Plaintiff's current operations.

However, that does not necessarily mean that there is no adequate remedy at law. The amount of Plaintiff's investment, the value of the business, the amount of profit—in short, the extent of the harm caused by an unlawful termination—are all measurable with a reasonable degree of precision. And, as the Court pointed out at the hearing, if Defendant has indeed breached the Franchise Agreement or otherwise committed a business tort, they may be liable in an amount well into the seven figures. But the Court is not convinced that Plaintiff lacks an adequate remedy at law if it prevails on the merits, for experts surely can provide quantitative measurements on the damages to Plaintiff caused by the termination. This factor tilts in Defendant's favor.

### C. Irreparable Harm

This discussion of the adequacy of the remedy at law provides an easy segue into a discussion of the irreparable harm that would follow absent an injunction. Plaintiff focuses on the harm to its financial interests and the continued operation of its two restaurants, and the foregoing discussion indicates that the harm would be substantial. Defendant counters that it would suffer irreparable harm if the injunction does issue, both to customers (who would be exposed to sub-par health and safety standards) and to the brand itself (as a bad experience at one franchisee can have

11

a ripple effect on the willingness of customers to patronize another).  At oral argument, Defendant's counsel cited negative customer reviews about Plaintiff's restaurants from online platforms as evidence for the harm it faced if Plaintiff's restaurants continued operating.  Plaintiff submitted positive customer reviews from an online platform in response.  See [9-1].  The Court reviewed these submissions but considering that they are unsworn statements from parties whose identity the Court cannot verify, the Court gives little weight to either set of online comments.

### D. Balancing of Irreparable Harm to the Parties

In balancing the harms, each side makes a well-supported argument.  The harm to Plaintiff may be more immediately serious, but the countervailing harm to the public and to Defendant's valuable brand are not insignificant.  This factor is close but leans slightly in favor of Plaintiff.

### E. Effects on Non-Parties and the Public Interest

The public has an interest in parties abiding by their contracts and in franchisors and franchisees treating each other fairly within the bounds of the agreements.  Based on the minimal evidence presented thus far, and the form in which it has been presented, the Court is ill-equipped to referee the dispute over whether Defendants have mistreated Plaintiff out of spite and ill-will (as Plaintiff contends) or whether Defendants are simply policing their brand and have terminated Plaintiff due to repeated violations of the food safety standards and other valid concerns (as Defendants contend).  Certainly the public also has an interest in both city inspectors and restaurant chains (both at the franchisor and franchisee levels) ensuring that food be maintained and served in a manner consistent with public health and safety.  The public interest balance tilts slightly in favor of Defendant, to approximately the same degree as the balance of harms leans in Plaintiff's favor.

## IV. Conclusion

In sum, although the balance of harms at least slightly favors Plaintiff, the minimal likelihood of success on the merits shown to date, the availability of money damages as a remedy if the termination of the Franchise Agreement turns out to have been unlawful, and the Court's overall assessment of the public interest favor Defendants. In these circumstances, a temporary restraining order is not warranted. See *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) ("[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.") (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)).

For the reasons stated above, Plaintiff's motion for a temporary restraining order [3] is denied. Counsel are directed to confer and file by 7/31/2019 a joint status report advising the Court as to the following: (1) whether Plaintiff wishes to pursue a preliminary injunction; (2) if so, what expedited discovery will be necessary in advance of a hearing on a motion for preliminary injunction and when that discovery will be completed; (3) a proposed briefing schedule on the motion for preliminary injunction; and (4) whether the parties anticipate that the motion can be resolved on the paper or will require live testimony and/or oral argument and, if either live testimony or oral argument are requested, how many hours of in-court time are anticipated. In the event that in-court time is requested, the Courtroom Deputy will contact counsel to schedule a date and time.

Dated: July 25, 2019

Robert M. Dow, Jr.
United States District Judge